DocuSign Envelope ID: D854DBB6-276D-4051-BBD6-BFA05B6470BD

EXECUTION VERSION

Obligation No. 22117154 (Operating Line of Credit 1)
Input Agreement 748526-11003
Input Agreement 748526-12001

## FORBEARANCE AGREEMENT

This Forbearance Agreement (the **"Agreement"**) is made and entered into as of January 22, 2024 (the "**Closing Date**"), by and among each of JOSEPH RANDALL ELLER, an unmarried person who is not part of a civil union or domestic partnership ("**R. Eller**"), WESCOR FARM OPERATIONS, LLC f/k/a WESCOR FARMING, LLC, a Virginia limited liability company ("**Wescor**"), each of which is a Borrower under the Loan and Security Documents identified below, on the one hand, and RABO AGRIFINANCE LLC, a Delaware limited liability company ("**RAF**" or "**Rabo**" or "**Lender**"), as the Lender under the Loan and Security Documents identified below, on the other hand. R. Eller and Wescor shall be referred to herein collectively as the **"Loan Parties,"** and individually as a **"Loan Party."** Non-Obligors Grayson Farm & Leasing, Inc., a Virginia corporation, Mountain Top Holding of Virginia/North Carolina, LLC, a Virginia limited liability company, DD&R Land Holdings, LLC, a Virginia limited liability company, NDRD Land Holdings, LLC, a Virginia limited liability company, D&R Land Holdings, LLC, a Virginia limited liability company, and Timber & Logging, LLC., a North Carolina limited liability company (collectively, the "**Grantors**" and separately, a "**Grantor**") join in this Agreement to acknowledge their consent and agreement to the terms contained herein. The Loan Parties, Grantors and RAF shall be referred to herein collectively as the "**Parties**."

## Recitals

A.      RAF is the secured creditor of the Loan Parties in connection with an Operating Line of Credit Loan in the maximum amount of $13,500,000.00, which is designated by RAF as Loan Obligation No. 22117154 (the "**Operating Line of Credit**" or the "**Loan**").

B.      RAF provided input financing to the Loan Parties pursuant to an Application and Account Agreement in the maximum amount of $350,000.00, which is designated by RAF as Loan Obligation Nos. 748526-11003 and 748526-12001 (the "**Inputs Agreement**" and together with the Loan, the "**Loans**" or "**RAF Indebtedness**").

C.      As of the October 17, 2023 (the "**Payoff Calculation Date**"), the amount of the RAF Indebtedness owed to RAF on the Loans was the total amount of **$10,054,302.19** (the "**Outstanding Amount Due**") (plus attorney's fees and costs and any additional amounts as noted below), consisting of the following:

Obligation No. 22117154 (Operating Line of Credit) (as of October 17, 2023)

| | |
|---|---|
| Principal: | $8,242,921.07 |
| Interest: | $  847,329.11 |
| Default Interest: | $  559,571.37 |
| Misc. Servicing Fee: | $        34.98 |

*Eller Forbearance Agreement*

TOTAL:                                            $9,649,856.53

Obligation No. 748526-11003

Principal:                                        $188,975.00
Interest:                                         $ 28,818.69
TOTAL:                                            $217,793.71

Obligation No. 748526-12001

Principal:                                        $160,976.25
Interest:                                         $ 25,675.71
TOTAL:                                            $186,651.96


The Outstanding Amounts Due set forth above do not include: (1) RAF's attorney's and consultant's fees and costs incurred as of the Payoff Calculation Date, together with contractual and default interest at the Default Rate to be owed on such attorney's and consultant's fees and costs from the date that they are paid by RAF, and (2) additional interest (both contractual non-default interest and default interest at the Default Rate), as well as attorney's and consultant's fees and costs and other charges allowed by the Loan Documents, that have and will continue to accrue since the Payoff Calculation Date, and would otherwise (in the absence of the forbearance waivers outlined in this Agreement) continue to be added to the Outstanding Amounts Due. The Loan Parties agree and acknowledge that they will not dispute RAF's right to be paid interest (both contractual and Default) and attorney's and consultant's fees and other costs and expenses as outlined in the Loan Documents (which interest, attorney's fees and other costs, consultant's fees and other costs and all other expenses that had been incurred but not yet booked by RAF as of the Payoff Calculation Dates are not included in the Outstanding Amounts Due set forth above), including such costs and expenses related to the costs of collection of the Loan (including attorney's and consultant's fees, court costs and other out-of-pocket expenses) as well as the costs and expenses incurred by RAF in connection with negotiating and documenting this Agreement, and the documentation of all documents contemplated by this Agreement.

D.     The writings evidencing the Loan and the RAF Indebtedness and the agreements between the Parties with respect to the Loan and the collateral securing the Loan (the "**Rabo Collateral**") include (but are not limited to) the following, as may be amended, modified and/or restated from time to time, all of which are collectively referred to as the "**Loan Documents**":

1.     That certain *Master Credit Agreement*, dated June 3, 2019, by and between R. Eller and RAF;

2.     That certain *Joinder*, dated May 14, 2020, by and between Wescor and RAF;

3.      That certain *Addendum to Master Credit Agreement*, dated May 14, 2020, by and between R. Eller and Wescor and RAF;

4.      That certain *Addendum to Master Credit Agreement*, dated November 16, 2021, by and between R. Eller and Wescor and RAF;

5.      That certain *Facility Sheet (Operating Line of Credit 1)*, dated May 14, 2020, by and between R. Eller, Wescor and RAF;

6.      That certain *Facility Sheet (Operating Line of Credit 1)*, dated June 4, 2021, by and between R. Eller, Wescor and RAF;

7.      That certain *Facility Sheet (Operating Line of Credit 1)*, dated November 16, 2021, by and between R. Eller, Wescor and RAF;

8.      That certain *Facility Sheet (Operating Line of Credit 1)*, dated May 17, 2022, by and between R. Eller, Wescor and RAF;

9.      That certain *Operating Line of Credit 1 Note*, dated May 14, 2020, in the principal amount of $10,000,000.00, executed by R. Eller and Wescor in favor of RAF;

10.      That certain *Operating Line of Credit 1 Note*, dated May 17, 2022, in the principal amount of $13,500,000.00, executed by R. Eller and Wescor in favor of RAF;

11.      That certain *Master Security Agreement*, dated June 3, 2019, executed by R. Eller, as Grantors, in favor of RAF;

12.      That certain *Master Security Agreement*, dated May 14, 2020, executed by R. Eller and Wescor, as Grantors, in favor of RAF; and

13.      That certain *Application and Account Agreement* dated February 27, 2020 executed Wescor in the maximum amount of $350,000.00.

E.      The Loan Parties' Obligations under the Loan are secured by properly perfected liens on and security interests in essentially all personal property owned by R. Eller and Wescor, including all of the following types or categories of personal property (hereinafter, the "**Personal Property Collateral**"):

1.      All accounts, contract rights, documents, documents of title, payment intangibles, investment property, chattel paper, instruments, and deposit accounts;

2.      All inventory;

3.      All equipment;

DocuSign Envelope ID: D854DBB6-276D-4051-BBD6-BFA05B6470BD

4. All fixtures;

5. All farm products, including crops grown, growing or to be grown, livestock born or unborn, supplies used or produced in farming operations, and products of crops or livestock in their unmanufactured state;

6. All general intangibles, including all Intellectual Property;

7. All proceeds of any crop insurance, price support payment or other government program;

8. All rights and interests under Hedging Agreements, including all rights to the payment of money from Secured Parties under the Hedging Agreements; and all accounts, deposit accounts, and general intangibles, including payment intangibles, described in the Hedging Agreements;

9. Accessions, attachments and other additions to the foregoing;

10. Substitutes or replacements for any of the foregoing, all proceeds, products, rents and profits of any of the foregoing, all rights under warranties and insurance contracts covering any of the foregoing, and any causes of actions relating to any of the foregoing; and

11. All books and records pertaining to any of the foregoing, including but not limited to any computer-readable memory and any computer hardware and software necessary to process such memory.

F. At all relevant times, R. Eller has been the sole member and owner of Wescor.

G. The Loan Parties acknowledge and agree that the Loans are cross-collateralized and cross-defaulted, that one or more Events of Default, as defined in the Loan Documents, has occurred with respect to the Loan, which Events of Default entitle RAF to exercise all legal, equitable and contractual rights against the Loan Parties and against the Rabo Collateral, including but not limited to the right to immediate liquidation, foreclosure and sale of the Rabo Collateral. The Loan Parties further acknowledge receipt of that certain *Notice of Acceleration and Demand for Payment of Indebtedness* (the "**Notice**"), which was dated on October 30, 2023 and was delivered to them by RAF's outside counsel at Womble Bond Dickinson (US) LLP.

H. The Loan Parties acknowledge and agree that the Notice provided them with notice that Events of Default had occurred and are ongoing under the Loan Documents. The Loan Parties further acknowledge and agree that, pursuant to the Notice, all Obligations due under the Loan Documents have been accelerated, and are now due and payable in full.

I. The Loan Parties have requested that RAF forbear from further exercising RAF's rights and remedies under the Loan Documents and against the Rabo Collateral. RAF is willing

to do so, but only in accordance with the terms and conditions of this Agreement, including specifically the release by the Loan Parties of any claims against RAF as outlined in this Agreement, such release to be effective upon the execution of this Agreement. RAF's forbearance shall continue so long as the Loan Parties remain in full compliance with all of the terms and conditions of this Agreement.

J.      The Loan Parties jointly and severally agree and acknowledge that (1) they do not dispute and will not dispute the Outstanding Amounts Due as of the Payoff Calculation Date, (2) they do not dispute and will not dispute that they will owe additional sums for interest (both contractual interest and default interest at the Default Rate), as well as reasonable attorney's fees and costs and other charges allowed by the Loan Documents, that will accrue on the Loan after the Payoff Calculation Date until such time as the Loan is paid and satisfied in full, pursuant to this Agreement or otherwise, (3) in the event RAF elects in its sole discretion to make additional protective advances, either to the Loan Parties or directly to third parties, for livestock, feed, care, maintenance, transportation, insurance, rent or other charges related to the Rabo Collateral, they will not dispute that the Loan Parties will owe additional sums, in an amount to be determined in the future, in the amount of such additional protective advances, plus any interest or other charges that may be owed under the Loan Documents as a result of such additional protective advances, and (4) as of the date of this Agreement, they have no defenses, offsets or claims related to RAF or the Notice or the Events of Default, or related to or arising under the Loan Documents, the Loan, or the administration or servicing of the Loan that will survive this Agreement.

K.      Grantors jointly and severally agree and acknowledge that in exchange for the pledging of liens upon their assets, Grantors are receiving valuable and direct consideration and benefit under the Agreement by Lender forbearing from initiating litigation involving transfers of property with and from the Loan Parties and from initiating insolvency proceedings against the Loan Parties that could directly and negatively impact the Grantors and their own insolvency issues.

## **Agreement**

Now, therefore, in consideration of the foregoing and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties hereby agree as follows:

1.      The Events of Default Related to the Loan Will Remain in Effect during the Forbearance Period, but Subject to the Forbearance Outlined in this Agreement. The Loan Parties jointly and severally represent, acknowledge and agree as follows:  (a) the Events of Default that currently exist under the Loan Documents, as outlined in the Notice, have occurred and are presently existing and cannot be cured, the Events of Default are material Events of Default under the Loan Documents, the Events of Default apply to the Loan, and RAF therefore has the immediate right to exercise all rights given to it under the Loan Documents, applicable law or in equity concerning the Loan Parties or the Rabo Collateral that was pledged to secure the Loan, (b) RAF is in full compliance with all of the terms and conditions of the Loan Documents and all other documents related to the Loan as of the Closing Date, and (c) the Loan is payable in full as of the

Closing Date, and the Loan Parties are unable to pay the Loan in full on the Closing Date. The Loan Parties also jointly and severally represent, acknowledge and agree that they do not and will not contest the foregoing, that they do not contest RAF's immediate right to exercise all rights given to it under the Loan Documents, applicable law or in equity concerning the Loan Parties or the Rabo Collateral, and they will not assert any defenses or offsets to the fact that the Events of Default have occurred and are continuing material Events of Default under the Loan Documents. The Loan Parties also jointly and severally acknowledge and agree that RAF is entitled to take any and all actions under the Loan Documents or applicable law during the Forbearance Period that RAF deems necessary to protect its rights and interests in the Rabo Collateral.

2.       <u>Immediate Appointment of Ampleo as CRO</u>.  By no later than Monday, December __, 2023, the Loan Parties shall formally retain CFO Solutions, LLC dba Ampleo ("**Ampleo**") as the Chief Restructuring Officer for Wescor, and as the sole officer and director for Wescor, and for the Rabo Collateral (Ampleo acting in this capacity is referred to herein as the "**CRO**"), and CRO shall work together with the Loan Parties to manage, control and oversee Wescor and the Rabo Collateral, including all funds dispersed or to be dispersed and all funds deposited or to be deposited, and all funds or proceeds from the sale or other liquidation of the Rabo Collateral. Additionally, any engagement agreement between the Loan Parties and the CRO, shall contain at least the following provisions:

A.       The CRO shall be authorized to perform the duties of the CRO of Wescor and the Rabo Collateral, and shall have joint authority with the Loan Parties to manage, control and oversee all of the funds of Wescor and of the proceeds from the sale of the Rabo Collateral, subject to advance written notice to RAF. Further, the CRO shall have joint authority and control with the Loan Parties over Wescor's bank accounts, and over all of the Loan Parties' books and financial records. For clarity, "joint authority", "joint authority and control", or "joint authority, control and management" as used in this Section 2 means that neither the CRO nor any of the Loan Parties may enter into any agreement, make any payment or take any action concerning Wescor's assets or the Rabo Collateral or proceeds of the Rabo Collateral in an amount in excess of $5,000.00 without the express written consent of the other.

B.       Wescor shall not purchase any assets (including any equipment or farm products, including livestock or feed) without the express written consent of the CRO, and R. Eller shall not purchase any assets using the proceeds of the Rabo Collateral without the express written consent of the CRO. Further, as noted above, the Loan Parties shall not sell, transfer, gift, encumber, hypothecate, move or otherwise impair the value of any of Wescor's assets or the Rabo Collateral without the express written consent of the CRO.

C.       Glenn Karlberg of Ampleo shall be designated as the CRO. Other Ampleo associates may be called upon to assist if needed at the CRO's discretion. Mr. Karlberg and his Ampleo associates are referred to herein as the "**CRO Team**." Except as otherwise provided, the CRO Team shall have joint authority and control with the Loan Parties over the banking, financial, accounting, and record keeping needs of Wescor, and shall specifically endeavor to improve accounting, record keeping and financial controls of Wescor and reporting by R. Eller. The CRO

shall have authority to provide such periodic reports to RAF as the CRO deems appropriate or as requested by RAF. Neither the CRO nor the CRO Team shall have any responsibility to file any federal, state or local tax returns for any of the Loan Parties, but the CRO may provide oversight as needed for the reporting and filing of the returns by the appropriate employees or outside accountants of Wescor. In the event RAF requests the appointment of a receiver for the Loan Parties or for the Rabo Collateral, the Loan Parties stipulate, acknowledge and agree to the appointment of a receiver for Wescor and/or the Rabo Collateral and that Ampleo may serve as the receiver, and the Loan Parties shall not contest or challenge Ampleo's appointment. For clarity, R. Eller does not stipulate, acknowledge or agree to the appointment of a receiver for himself but acknowledges that RAF has the right to request such appointment.

D.      The CRO shall have joint authority, control and management of all of the funds of Wescor and all proceeds of the Rabo Collateral. The Loan Parties shall immediately provide access to all bank accounts of Wescor and all bank accounts containing proceeds of the Rabo Collateral to the CRO, and shall provide to the CRO all of the financial and operating information and documentation concerning the Loan Parties' business operations relating to the Rabo Collateral that the CRO shall request from the Loan Parties from time to time. Further, the CRO shall have joint signature control of Wescor's bank and other financial accounts and any bank and other financial accounts that contain proceeds of the Rabo Collateral.

E.      Wescor, with the consent of the CRO, shall be authorized to purchase feed and other supplies and to pay salaries and to pay the ongoing expenses of running Wescor's business.

F.      The Loan Parties may need additional cash (the "**Cash Shortfall**") to fund Wescor's operations during the forbearance period. To fund the Cash Shortfall, RAF may make additional over-advances and protective advances under RAF's Operating Line of Credit. If and to the extent RAF elects in its sole and absolute discretion to make such advances, then such advances shall be deemed to have been made under and pursuant to the terms of the Loan Documents and shall be further deemed to have been made as protective advances in order to protect the Rabo Collateral that secures the Loan (such advances being referred to herein as the "**Protective Advances**"). The timing, amount and frequency of any Protective Advances shall be in RAF's sole and absolute discretion. If and to the extent RAF agrees to make any Protective Advances, the Loan Parties each jointly and severally agree and acknowledge that they will not dispute RAF's right to be repaid for the Protective Advances and that Default Interest shall accrue on the Protective Advances from the times that such funds are advanced until repaid in full.

G.      The CRO is authorized by the Loan Parties to communicate with RAF as requested by RAF, including providing written or oral status reports. If requested, the CRO is also authorized to provide to RAF copies of the Loan Parties' Quick Books files, if any. Further, if requested, the CRO is also authorized to provide RAF with copies of the Loan Parties' federal and state tax returns, including all schedules, for all tax years. The CRO shall inform the Loan Parties and their counsel of any request by RAF for such information and a copy of any information provided by the CRO to RAF contemporaneously with the transmittal of such information.

H.      The CRO is authorized to provide RAF with one or more rolling cash-flow budgets to cover anticipated expenses during the forbearance period, as well as such other banking, financial and accounting information concerning the Loan Parties that RAF may request. Absent the express written consent of both RAF and the CRO, no cattle or other livestock will be purchased or bred during the forbearance period.

I.      The Loan Parties shall at all times fully cooperate with the CRO Team and shall take no action which interferes, directly or indirectly, with the duties of the CRO as outlined in this Agreement or in any separate agreements between the Loan Parties and the CRO.

J.      The Loan Parties shall at all times act in good faith to support the CRO Team in performing its duties and shall provide the CRO Team with access to all books and records related to Wescor or the Rabo Collateral, including but not limited to, all banking and accounting records, contracts for services to be provided the Loan Parties, union contracts, licenses, permits, applications, purchase and sale agreements, and insurance policies. The Loan Parties shall cooperate to ensure that books, records and accounts held by outside parties are turned over to the CRO. The Loan Parties' owners, agents, and employees shall fully and timely cooperate with the CRO in connection with the performance of its duties and shall not interfere with the CRO's performance of such duties. In the event a dispute arises between the CRO and the Loan Parties, or any existing or former owner, officer, agent, or employee of the Loan Parties, regarding their compliance with this paragraph, the CRO shall have the right, after first seeking to remedy such dispute by notifying counsel for the Loan Parties and providing a reasonable period of time, in RAF's reasonable judgment, to resolve such dispute, to seek a Court order, on five (5) business days' notice, enforcing the terms of this Agreement.

K.      The Loan Parties shall indemnify the CRO Team on the same terms as provided to its other officers and directors under Wescor's articles, bylaws, operating agreements, company agreements or other company governing documents (e.g., board, manager, member or shareholder resolutions) (collectively, the "**Governing Documents**") and applicable state law and can and will provide insurance coverage for the CRO and the CRO Team under its D&O policy. In the event Wescor does not currently have a D&O policy, the CRO may acquire a D&O policy which provides insurance coverage for the CRO and the CRO Team on terms typical in the industry in which the Loan Parties operates.

L.      RAF may, in its sole discretion, but shall have no obligation to, advance to the Loan Parties funds necessary to pay all amounts payable to the CRO. All such advances, if agreed to by RAF in the future, shall be considered by the Parties as Protective Advances made pursuant to the terms of the Loan Documents, and shall be secured by the Rabo Collateral.

M.      The Loan Parties may only terminate the CRO Team, with or without cause, upon giving no less than thirty (30) days advanced written notice to both RAF and the CRO.

3.      Forbearance Period; Event of Termination; Forbearance Conditions.

A.      <u>Forbearance Period</u>.  Expressly conditioned upon the satisfaction of all of the conditions to the effectiveness of this Agreement before this Agreement becomes effective, and further subject to the continuing satisfaction of all of the terms and conditions set forth in this Agreement, RAF hereby agrees to forbear from the Closing Date until an Event of Termination (as defined below) occurs (referred to herein as the "**Forbearance Period**") from its immediate right to exercise all rights given to it under the Loan Documents, applicable law or in equity with respect to the Loan and concerning the Loan Parties and/or the Rabo Collateral.  The forbearance provided by RAF pursuant to this Agreement is conditioned upon the following, the failure of any of which shall constitute an Event of Termination: (i) this Agreement has been fully executed by all of the Loan Parties, (ii) the Loan Parties provide RAF with all other documentation required by RAF to be provided in connection with this Agreement, and (iii) the Loan Parties shall cooperate fully with the CRO and will immediately provide to the CRO all of the financial and operating information and documentation concerning the business operations of Wescor and the Grantors that the CRO shall request from the Loan Parties from time to time, and RAF authorizes the Loan Parties to release to the CRO all of the requested financial and operating information and documentation.

B.      <u>Events of Termination</u>.   The Forbearance Period provided by this Agreement shall terminate, without notice to any of the Loan Parties, upon the occurrence of any Event of Termination.  The term **"Event of Termination"** means the occurrence of any of the following events: (i) a Forbearance Default has occurred and has not been cured within the cure period outlined above, (ii) any of the Loan Parties fails to meet or satisfy any of the conditions to the effectiveness of this Agreement, or fails to satisfy any other agreement, covenant or condition outlined in this Agreement, or the occurrence of any other event outlined in this Agreement which is stated to be an Event of Termination, and any of the foregoing is not cured (if it can be cured) by the end of the cure period outlined above, or (iii) the end of the Forbearance Period, which is **April 1, 2024**.

Upon the occurrence of any Event of Termination, without releasing, waiving, impairing, or otherwise affecting the Loan Parties' respective warranties, covenants, agreements, consents and waivers under this Agreement and the other Loan Documents, RAF may in its sole and absolute discretion, without any demand, presentment, protest or notice (all of which each of the Loan Parties hereby waives) exercise any and all of the rights, remedies, powers, and privileges available to RAF under the Loan Documents, or pursuant to applicable law or in equity, with respect to the Loan Parties, the Loan, the RAF Indebtedness, and/or the Rabo Collateral. Furthermore, upon the occurrence of any Event of Termination, which is not cured within five (5) business days following notice to the Loan Parties through its counsel, the Loan Parties agree, consent and waive any objection or challenge to the appointment of a receiver over Wescor or the Rabo Collateral, but not including a receiver for R. Eller, and RAF may submit this Agreement to any court of competent jurisdiction as evidence and proof of the Loan Parties' agreement, consent and waiver of opposition to the appointment of a receiver, whether general or limited, for Wescor and/or the Rabo Collateral.

      C.    <u>Forbearance Conditions</u>.  During the Forbearance Period, RAF agrees to forbear from exercising any and all rights and remedies under the Loan Documents as a result of the Existing Default provided that the following conditions are met (collectively, the "<u>Forbearance Conditions</u>"):

      1.    <u>Performance Under Loan Documents and This Agreement</u>.  Except as otherwise expressly stated herein, the Loan Parties duly and punctually observe, perform and discharge each and every term, condition, obligation and covenant to be performed under the Loan Documents and this Agreement.

      2.    <u>Additional Collateral</u>.  The Loan Parties and Grantors shall pledge, encumber, secure, perfect and otherwise consent to the granting of a first priority senior lien or liens to secure the Loans and obligations to RAF on real estate identified on Exhibit A (hereinafter, the "**Phase I Additional Collateral**") and Exhibit B (hereinafter, the "**Phase II Additional Collateral**" and collectively with the Phase I Additional Collateral, the "**Additional Collateral**" and herein included as the Rabo Collateral) and shall sign and execute any additional documentation in a form acceptable to RAF to pledge, encumber secure, perfect and consent to RAF's lien on the Additional Collateral. RAF acknowledges that the Additional Collateral may be subject to prior perfected liens, and in such instances the Grantors shall grant junior liens in such Additional Collateral.

      3.    <u>Liquidation of Collateral</u>.  The Loan Parties and CRO, with the prior approval and consent of RAF, shall coordinate and execute an orderly liquidation of the Rabo Collateral as set forth below.  Notwithstanding the foregoing, the Loan Parties, CRO and Grantors shall not sell, transfer, gift, encumber, hypothecate, move, or otherwise impair the value of any of Rabo Collateral, including without limitation any of the Loan Parties' equipment, rolling stock, farm products (including livestock and feed), or membership interests in the Grantors, without the express written consent of RAF.

      a.    <u>Liquidation of Personal Property Collateral</u>.

      i.    *Wescor's Personal Property Collateral*.  During the Forbearance Period, the CRO, and with the prior approval and consent of RAF, shall (i) undertake an orderly liquidation of Wescor's Personal Property Collateral in good faith and in a commercially reasonable manner and acceptable to RAF; (ii) shall immediately remit the sale proceeds to RAF, net of all real estate taxes, commissions and other customary settlement charges, except as otherwise provided for or allowed by this Agreement; (iii) shall immediately cease all breeding and reproduction of livestock unless otherwise expressly agreed to by RAF; (iv) shall promptly provide to RAF copies of sale tickets, receipts, bills of sale and other proof of sale of Wescor's Personal Property Collateral; (v) shall obtain RAF's prior approval of all private and public sales, auction agreements and commissions related to the equipment, machinery,

DocuSign Envelope ID: D854DBB6-276D-4051-BBD6-BFA05B6470BD

rolling stock and farm products; (vi) shall timely file all crop insurance claims, provide copies of the same to RAF and immediately remit and turnover to RAF all insurance proceeds; (ix) shall immediately turnover and remit to RAF all government program payments and proceeds. RAF shall apply the proceeds to the Loans at its sole discretion.

    ii. *R. Eller Personal Property Collateral*. Within thirty (30) days of the Closing Date, the CRO and R. Eller shall propose to RAF a plan for the liquidation of the R. Eller Personal Property Collateral (the "**R. Eller Personal Property Sales Plan**"). The R. Eller Personal Property Sales Plan shall set forth what, if any, of the R. Eller Personal Property Collateral should be marketed and sold, the matter and method of sale, the timetable, budget and remittance of the net sale proceeds to RAF following the satisfaction of valid senior liens and encumbrances and payment of ordinary and customary costs of sale to RAF. RAF shall apply the net proceeds to the Loans at its sole discretion. R. Eller's ownership and economic interests in the entities listed on **Exhibit C** shall not be liquidated unless and until the CRO determines, in the exercise of his reasonable business judgment, that the proceeds from the sale of all other Personal Property Collateral and Additional Collateral will not be sufficient to pay the Loans, including all Protective Advances, RAF's legal fees and costs and the CRO's fees and costs, in full.

b.    <u>Liquidation of Additional Collateral</u>. Within thirty (30) days of the Closing Date, the CRO, Grantors and Loan Parties shall (i) formulate and propose to RAF a marketing and sales plan that includes, but is not limited to, the price, manner, timetable, estimated sellout period, costs, commissions, proposed broker/agent and budget for the liquidation for the Additional Collateral (the "**Sales Plan**"); (ii) list and market the Real Estate Collateral with a licensed, reputable real estate broker consistent with the Sales Plan; (iii) provide copies of all offers to purchase to RAF within three (3) business days of receipt, and RAF shall, within a reasonable time thereafter, approve or reject the proposed sale in its sole discretion; (iv) immediately provide copies of all executed offers to purchase to RAF; and (v) remit all proceeds to RAF, net of all real estate taxes, commissions and other customary settlement charges following the satisfaction of valid senior liens and encumbrances and payment of ordinary and customary costs of sale to RAF. The CRO, Grantors and Loan Parties shall not execute the Sales Plan without the prior approval and consent of RAF, which shall not be

DocuSign Envelope ID: D854DBB6-276D-4051-BBD6-BFA05B6470BD

unreasonably withheld. RAF shall apply the proceeds to the Loans at its sole discretion. The failure of the CRO, Grantors and Loan Parties to timely present an acceptable Sales Plan to RAF and a default by the Loan Parties or one or more of the Grantors under the Sales Plan and the other terms and conditions of this Section shall be an Event of Termination.

Prior to all or part of the Additional Collateral being sold and at the direction of and/or with prior approval and consent of RAF, with such approval not to be unreasonably withheld, the Loan Parties and any entity in which R. Eller is a stakeholder or has an ownership or economic interest (hereinafter referred to as an "**Insider**") may set aside, transfer, re-convey, deed or otherwise pass title or shall cause the Insider to set aside, transfer, re-convey, deed or otherwise pass title of any one or more of the Additional Collateral from the Insider to the immediate prior owner, provided (*i*) such immediate prior transfer was for no or insufficient consideration, (*ii*) the immediate prior owner who is to retake or regain title to the property is a Loan Party or also an Insider at the time of the re-conveyance and (*iii*) RAF's lien is not affected, voided or voidable.

4. <u>Payment of Fees and Expenses</u>. On or before the earlier of the expiration of the Forbearance Period or the termination of this Agreement, the Loan Parties jointly and severally agree to pay to, or reimburse RAF for RAF's legal fees and expenses related to the Loan Parties, including, but not limited to, the reasonable and documented out-of-pocket fees, charges and disbursement of counsel, paralegals and consultants for RAF, incurred prior to and after the Effective Date, in connection with the analysis, documentation, negotiation, investigation, preparation, closing and execution of this Agreement (the "**Legal Fees**").

5. <u>Default Interest Rate</u>. Beginning on May 1, 2023, default interest in the amount of ten percent (10%) in excess of the current rate applicable to the Loan shall accrue and be payable at the earlier of the expiration of the Forbearance Period or the termination of this Agreement. RAF will waiver all accrued default interest, provided the following conditions are satisfied: (i) no additional default under the Agreement or the Loan Documents exists, and (ii) full payoff of all RAF obligations is received on or before the expiration of the Forbearance Period.

6. <u>Budget</u>. As a condition for RAF's forbearance, Wescor and the CRO shall submit to RAF a budget (the "<u>Budget</u>") prepared by Loan Parties in good faith and in form and substance acceptable to RAF for RAF's sole approval starting the first full week following the Effective Date for the operation of Wescor during the Forbearance Period, and shall be submitted to RAF on or before the Effective Date or as soon as practical thereafter but in no event later than ten (10) days following the Effective Date. The Budget

DocuSign Envelope ID: D854DBB6-276D-4051-BBD6-BFA05B6470BD

shall include all outstanding expenses due and owing prior to the Forbearance Period, including, but not limited to, the Legal Fees, CRO's fees, and any unpaid interest. The Budget shall not include the payment of equity and subordinate debt of Wescor, including, but not limited to, any management fees, legal fees and interest. Wescor shall operate in accordance with the Budget approved by RAF and shall not revise, modify or amend the Budget without RAF's prior written consent.

7. <u>Weekly Meeting Requirement</u>. The Loan Parties or its designated representative and/or counsel shall be required to organize and attend weekly in-person or virtual meetings between RAF, Loan Parties, and CRO where the Loan Parties shall provide weekly rolling cash flow forecasts, as well as dashboard reporting on collateral sales and pipeline, collateral liquidation and procedures, accounts receivable and accounts payable aging summaries, and inventory snapshot.

8. <u>No Material Adverse Change</u>. After the Effective Date, no material adverse change occurs in the Loan Parties' business, prospects or financial condition or the value of the Collateral. RAF acknowledges that J. Eller is in the process of winding down his personal business holdings, and to the extent that the sale or liquidation of such holdings that are not a part of the Rabo Collateral are done with the full knowledge and understanding of RAF, such actions do not constitute a material adverse change as contemplated by this paragraph.

9. <u>Representations and Warranties</u>. No representation or warranty made by the Loan Parties in this Agreement proves to have been false or misleading in any material respect.

10. <u>Bankruptcy; Insolvency</u>. No Loan Party (i) becomes the debtor in a voluntary or involuntary proceeding under the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.*, (ii) is adjudicated insolvent in any proceeding by a court or agency of competent jurisdiction, (iii) has a receiver or trustee appointed to manage its assets or business affairs, (iv) avails itself of any state court insolvency proceedings, or (v) makes or files an assignment for the benefit of creditors.

11. <u>Preexisting Debt</u>. There is no payment by Wescor on account of any preexisting debt to creditors, except that Wescor, with prior approval and consent of the CRO, may make payments in the ordinary course of business for current taxes or accounts payable as the same come due. R. Eller shall inform RAF of any anticipated or planned payments or settlements of his business obligations to third parties prior to making such payments and attest that such payments are not being made from funds or proceeds of any Rabo Collateral.

12. <u>Equity Interests</u>. Wescor shall not, without RAF's written consent, to be given or withheld in the RAF's sole and absolute discretion, suffer a Change in Control. The term "**Change in Control**" means (a) a change in the identity of any partner, manager,

member or owner thereof, or any partner, member or owner shall cease to own, directly or indirectly, at least the same percentage of the partnership, membership or ownership interests as are owned by such partner, member or owner as of the Effective Date, in either case without the prior written consent of the RAF to be given or withheld in the RAF's reasonable discretion, (b) a change in the senior management, key personnel, general partner or the manager (including the admission of an additional or successor general partner, manager or managing member) without the prior written consent of the RAF, to be given or withheld in the RAF's reasonable discretion, (c) the sale of all or substantially all of its assets, or (d) its liquidation or dissolution or its adoption of any plan of liquidation or dissolution or its public announcement of its intention to liquidate or dissolve. It is expressly acknowledged by the Parties that the provisions of this paragraph do **not** create a fiduciary relationship between the RAF and the Loan Parties.

4.     The Loan Parties' Obligations Under the Loan Documents are Absolute and Unconditional. Each of the Loan Parties hereby ratifies and confirms all of the Loan Documents and the RAF Indebtedness in all respects as of the Closing Date, except as expressly waived or modified by this Agreement. The Loan Parties hereby jointly and severally represent, acknowledge and agree that their obligations to pay and perform all of their Obligations under the Loan Documents and to satisfy all of their duties under the Loan Documents are absolute and unconditional, and there exists no right of set-off or recoupment, counterclaim or defense of any kind or nature whatsoever to payment and performance of the RAF Indebtedness and fulfillment of the Loan Parties' duties under the Loan Documents.

5.     Notice of Occurrence of a Forbearance Default and Cure Period. The term "**Forbearance Default**" shall mean the occurrence of any one or more of the following: (a) the Loan Parties fail or refuse to comply with any of the obligations or duties or covenants imposed upon them under this Agreement and under the other Loan Documents (except to the extent such obligations or duties or covenants are expressly waived, modified or forgiven by this Agreement), (b) any representation or warranty made by any of the Loan Parties in this Agreement is deemed by RAF to be materially incorrect or misleading, or (c) the occurrence of any event that will become an Event of Termination under this Agreement if not cured on a timely basis as outlined below. Notwithstanding anything to the contrary in the Loan Documents, RAF shall provide to the Loan Parties written notice of any Forbearance Default, and the Loan Parties shall have five (5) calendar days to cure the Forbearance Default (if such Forbearance Default can be cured) before such Forbearance Default shall become an Event of Termination under this Agreement.

6.     Release and Waiver of Claims. THE LOAN PARTIES, JOINTLY AND SEVERALLY, BOTH FOR THEMSELVES AND FOR ALL PERSONS OR ENTITIES CLAIMING BY, THROUGH OR UNDER THEM, HEREBY WAIVE, RELEASE AND FULLY DISCHARGE RAF, AND RAF'S PARENTS, SUBSIDIARIES, AFFILIATES, PREDECESSORS, SUCCESSORS, ASSIGNS, PARTICIPANTS, AGENTS, ATTORNEYS, EMPLOYEES AND REPRESENTATIVES (COLLECTIVELY, THE "**RELEASED PARTIES**") FROM ANY AND ALL MANNER OF CLAIMS, ACTIONS, CAUSES OF ACTION IN LAW OR IN EQUITY, SUITS, DEBTS, LIENS, CONTRACTS, LIABILITIES,

CLAIMS, DEMANDS, DAMAGES, LOSSES, FEES, COSTS, EXPENSES, SET OFFS, OR CLAIMS FOR RECOUPMENT, OF ANY NATURE WHATSOEVER, KNOWN OR UNKNOWN, FIXED OR CONTINGENT THAT ANY OF THE LOAN PARTIES HAVE OR MAY HAVE OR CLAIM AGAINST THE RELEASED PARTIES, FROM THE BEGINNING OF TIME TO THE DATE OF EXECUTION OF THIS AGREEMENT, BASED UPON ANY CONDUCT, CLAIMS, ACTIONS OR OMISSIONS OF THE RELEASED PARTIES RELATING OR PERTAINING IN ANY WAY TO THE LOAN, THE LOAN DOCUMENTS, THE RAF INDEBTEDNESS, THE NOTICE, THE NEGOTIATIONS RELATING TO THIS AGREEMENT, OR ANY OTHER ACT OR OMISSION THAT HAS OCCURRED PRIOR TO THE EXECUTION OF THIS AGREEMENT, INCLUDING BUT NOT LIMITED TO ANY AND ALL CLAIMS OR CAUSES OF ACTION FOR USURY, FRAUD, DECEIT, MISREPRESENTATION, UNCONSCIONABILITY, DURESS, LENDER LIABILITY, ANY OTHER CLAIM IN TORT OR CONTRACT OR AT EQUITY, OR FOR VIOLATION OF ANY LAW, RULE OR REGULATION.

7.    <u>Loan Parties' Representations and Warranties</u>.  The Loan Parties hereby jointly and severally represent and warrant to RAF as follows:

A.    <u>Recitals</u>.  The Recitals in this Agreement are true and correct in all material respects and are hereby incorporated into the binding agreements outlined in this Agreement.

B.    <u>Incorporation of Representations</u>.  There has been no material change in the management or ownership structure of Wescor since July 1, 2023.  No Loan Party is the subject of any Judgment (as defined in the Loan Documents), and there is no lawsuit, tax claim or other dispute pending against any Loan Party other than those identified in **Exhibit D**.  The Loan Parties shall amend **Exhibit D** upon the discovery of any Judgment, lawsuit, tax claim or other dispute that they become aware of during the Forbearance Period.

C.    <u>Power and Authority</u>.  The execution, delivery, and performance of this Agreement by each of the Loan Parties has been duly authorized by all necessary action, and does not and will not contravene any governing documents of any of the Loan Parties, violate any provision of any law, rule, regulation, order, writ, judgment, injunction, decree of determination presently in effect having applicability to any of the Loan Parties, result in a breach of or constitute a default under any promissory note, mortgage, indenture, loan or credit agreement, or any other agreement, lease or instrument to which any of the Loan Parties is a party or by which its or his assets or properties may be bound or affected, or result in or require the creation or imposition of any Lien as defined in the Loan Documents (other than any Lien created in favor of RAF under the Loan Documents), upon or with respect to any of the properties now owned or hereafter acquired by such Loan Parties.

D.    <u>Legally Enforceable Agreement</u>.  This Agreement is, and each other document delivered in connection with this Agreement, will be legal, valid and binding obligations of the Loan Parties, enforceable against each of the Loan Parties in accordance with their respective terms, except to the extent that the enforcement may be limited by applicable bankruptcy,

DocuSign Envelope ID: D854DBB6-276D-4051-BBD6-BFA05B6470BD

insolvency, and other similar laws affecting creditors' rights generally.

E.    <u>No Assignment or Transfer of Any Claim.</u>  There has been no assignment or other transfer of a claim, cause of action or other liability which might affect or impair the releases set forth in this Agreement, and no Loan Party has filed or asserted any claims concerning the subject matter of this Agreement that are not covered by this Agreement.

8.    <u>Bankruptcy Waiver.</u>  IN THE EVENT WESCOR OR ONE OR MORE OF THE GRANTORS FILES A VOLUNTARY PETITION FOR RELIEF UNDER THE BANKRUPTCY CODE OR ANY STATE INSOLVENCY OR RECEIVERSHIP LAWS OR IN THE EVENT AN INVOLUNTARY PETITION IS FILED AGAINST WESCOR OR ONE OR MORE OF THE GRANTORS UNDER THE BANKRUPTCY CODE OR ANY STATE INSOLVENCY OR RECEIVERSHIP LAWS AND SUCH INVOLUNTARY PETITION IS NOT DISMISSED WITHIN THIRTY (30) DAYS OF FILING, WESCOR AND EACH OF THE GRANTORS HEREBY EXPRESSLY AND KNOWINGLY WAIVES ANY AND ALL PROTECTIONS UNDER THE AUTOMATIC STAY IMPOSED BY THE BANKRUPTCY CODE OR ANY STATE LAWS IMPOSING A STAY SIMILAR TO THAT CONTAINED IN THE BANKRUPTCY CODE, AND HEREBY AGREES NOT TO OPPOSE OR DEFEND AGAINST ANY MOTION OR PETITION BY RAF (WHICH MAY BE MADE EX PARTE) FOR AN IMMEDIATE MODIFICATION, TERMINATION, OR ANNULMENT OF THE AUTOMATIC STAY OR OTHER RELIEF FROM THE AUTOMATIC STAY WITH RESPECT TO THE RABO COLLATERAL AND ANY OTHER COLLATEARL NOW OR HEREAFTER GRANTED IN CONNECTION WITH THE LOAN DOCUMENTS.

9.    <u>Jury Waiver.</u>  THE LOAN PARTIES HEREBY JOINTLY AND SEVERALLY IRREVOCABLY WAIVE ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THE RAF INDEBTEDNESS, THE LOAN, THE LOAN DOCUMENTS, THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.

10.    <u>No Commitment.</u>  EXCEPT AS SPECIFICALLY PROVIDED IN THIS AGREEMENT, RAF IS NOT COMMITTED, AND IS NOT COMMITTING, TO EXTEND, MODIFY OR OTHERWISE RESTRUCTURE THE LOAN, OR FORBEAR FROM EXERCISING ANY OF ITS RIGHTS OR REMEDIES UNDER THE LOAN DOCUMENTS OR UNDER APPLICABLE LAW OR IN EQUITY.  NO PRIOR COURSE OF DEALING, NO USAGE OF TRADE, AND NO ORAL STATEMENTS OR COMMENTS BY RAF OR ITS OFFICERS, EMPLOYEES, ATTORNEYS OR OTHER AGENTS WILL BE DEEMED TO BE A COMMITMENT BY RAF TO EXTEND, MODIFY, OR OTHERWISE RESTRUCTURE THE LOAN OR FORBEAR FROM EXERCISING ANY OF RAF'S RIGHTS OR REMEDIES, EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, OR UNLESS THE SAME SHALL BE REDUCED IN WRITING AND SIGNED BY AUTHORIZED REPRESENTATIVES OF RAF.

11.    <u>Document Understood.</u>  BY THEIR SIGNATURES BELOW, EACH OF THE LOAN PARTIES ACKNOWLEDGES AND AGREES THAT: (A) THIS AGREEMENT

CONTAINS A COMPLETE WAIVER AND RELEASE BY EACH OF THE LOAN PARTIES OF CERTAIN CLAIMS AND A WAIVER OF CERTAIN RIGHTS; AND (B) EACH OF THE LOAN PARTIES HAS READ AND UNDERSTOOD THIS AGREEMENT IN ITS ENTIRETY PRIOR TO SIGNING AND FULLY AGREES TO EACH, ALL AND EVERY PROVISION OF THIS AGREEMENT.

12.  <u>Effectiveness</u>.  Except to the extent specifically amended or modified or waived by the terms of this Agreement, all of the terms, conditions and provisions of the Loan Documents will remain unmodified, and the Loan Documents, to the extent amended or otherwise affected by the specific terms of this Agreement, remain in full force and effect.  All references to the Loan Documents in this Agreement or in any other document or instrument between any of the Loan Parties and RAF will be construed to be references to the Loan Documents to the extent modified or waived by the specific terms of this Agreement.

13.  <u>No Waiver</u>.  The Loan Parties agree that nothing in this Agreement is intended, nor should it be construed, as (A) an extension of the Maturity Date for the Loan, a commitment by RAF to make any new loan, or to grant or extend any financial accommodations to Loan Parties (other than those forbearance accommodations expressly stated in this Agreement), (B) a commitment by RAF to restructure the Loan or any of the other Loan Documents, or to grant any financial accommodations with respect to the same (other than those forbearance accommodations expressly stated in this Agreement), (C) a commitment by RAF to accept any future proposal submitted by the Loan Parties, whether in the form submitted or in any negotiated or modified form, or (D) a waiver or a modification of or a forbearance from exercising any of RAF's rights, powers, remedies, and privileges in law and/or in equity under and with respect to the Loan or the Loan Documents, or otherwise (other than those forbearance accommodations expressly stated in this Agreement).  This Agreement does not constitute a waiver of rights with respect to the existing Events of Default, but only constitutes a forbearance with respect to the existing Events of Default, and RAF shall be entitled to exercise all of its rights and remedies upon the occurrence of an Event of Termination under this Agreement.  It is expressly understood and agreed in this Agreement that any actions required herein and the absence of any other action at this time or at any time or times hereafter, or not to otherwise require strict performance of any provision of this Agreement or any other of the Loan Documents, shall not waive, affect or diminish the rights of RAF to thereafter and that hereafter demand strict compliance and performance therewith, and shall not suspend, waive or affect any right, power or remedy granted to RAF under this Agreement or any other of the Loan Documents.  RAF fully reserves all rights and remedies available to it regarding the Loan, the Loan Parties, all Rabo Collateral and any other property or assets that have been pledged to secure the Loan, and all related matters, including but not limited to the right to pursue any and all legal or equitable claims against the Loan Parties, the right to seek a receiver over the Loan Parties and some or all of the Rabo Collateral or any other property and assets that have been pledged to secure the Loan, and the right to otherwise enforce its liens and security interests in the Rabo Collateral and any other property and assets have been pledged to secure the Loan, and the failure of RAF to exercise any such rights and remedies, either now or in the future, shall not be deemed a waiver by RAF of any rights or remedies that are or may become available to it, all of which are fully preserved.

14.     <u>No Novation</u>.  This Agreement is not a novation, modification or refinance of any of the Loan Documents, and the Loan Documents have not been amended, modified  or  changed in  any  respect and remain enforceable against the Loan Parties in accordance with all stated terms. In the event of any conflict or inconsistency between this Agreement and the terms of any Loan Document, the terms of this Agreement shall be controlling.

15.     <u>Reaffirmation</u>. The Loan Documents are hereby ratified and reaffirmed in all respects and shall remain in full force and effect.  The execution of, or failure to execute, this Agreement by a Loan Party shall not be deemed to constitute a reduction, limitation, impairment,  release, modification or termination of any obligations, any guarantee and/or any lien or security interest on any collateral for any reason with respect to any Loan Party, including, without limitation, by any claim of waiver, release, surrender, modification, alteration or compromise, and shall not give rise to any defense or setoff, counterclaim, recoupment or termination whatsoever, whether by reason of the invalidity, illegality or unenforceability of any obligations, any guarantee, any lien, or any security interest on any collateral or any other circumstance in law or in equity that could result in the discharge, reduction or modification of any obligations of any Loan Party under any of the Loan Documents and/or any lien or security interest on any collateral.  For the avoidance of doubt, and notwithstanding anything in this Agreement to the contrary, RAF shall be under no obligation to forbear from exercising any rights or remedies under the Loan Documents, in law or in equity against any Obligor that does not execute this Agreement or against any property of  any  such  Obligor,  whether  during  the Forbearance Period or otherwise, and RAF's ability to exercise its rights and remedies under the Loan Documents, in law or in equity, whether as a result of any Specified Events of Default, any other default  or  any  other circumstance, shall not be impaired or modified as to any Loan Party that does not execute this Agreement or any property of any such Loan Party

16.     <u>Integration.</u>  This Agreement supersedes any prior understandings or agreements between the Parties, whether written or verbal, respecting the subject matter of this Agreement and contains the entire understanding of the Parties with respect thereto.

17.     <u>Governing Law, Jurisdiction and Venue.</u>  This Agreement shall be subject to the governing law provisions found in the Loan Documents, which provisions are incorporated herein by reference.

18.     <u>Effectuation of Agreement.</u>  The Parties agree to perform any other or further acts, and execute and deliver any other or further documents, as may be necessary or appropriate to implement this Agreement.

19.     <u>Construction of Agreement.</u>  This Agreement shall be construed as a whole in accordance with its fair meaning and in accordance with governing law.  This Agreement has been negotiated by each of the Parties (or their respective counsel) and the language of the Agreement shall not be construed for or against any particular Party.

20.    <u>Counterparts.</u>    This Agreement may be executed in any number of identical counterparts, each of which, once executed and delivered in accordance with the terms of this Agreement, will be deemed an original, with all such counterparts taken together constituting one and the same instrument.  Delivery by facsimile, encrypted e-mail or e-mail file attachment of any such executed counterpart to this Agreement will be deemed the equivalent of the delivery of the original executed agreement or instrument.

[SIGNATURE PAGE TO FOLLOW]

IN WITNESS WHEREOF, the Parties hereto have duly executed this Forbearance Agreement as of the Closing Date first above written.

**LOAN PARTIES:**

**WESCOR FARMING, LLC**, a Virginia limited liability company

By: _____
Name: Joseph Randall Eller
Title: Sole Member


_____
**JOSEPH RANDALL ELLER**, an individual



**GRANTORS:**

**GRAYSON FARM & LEASING, INC.**

By: _____
Name: Joseph Randall Eller
Title: President


**MOUNTAIN TOP HOLDINGS OF VIRGINIA/NORTH CAROLINA, LLC**, a Virginia limited liability company

By: _____
Name: Joseph Randall Eller
Title: Sole Member

**DD&R LAND HOLDINGS, LLC**, a Virginia limited liability company

By: _____

Name: Joseph Randall Eller

Title: Sole Member

**NDRD LAND HOLDINGS, LLC**, a Virginia limited liability company

By: _____

Name: Joseph Randall Eller

Title: Sole Member

**D&R LAND HOLDINGS, LLC**, a Virginia limited liability company

By: _____

Name: Joseph Randall Eller

Title: Sole Member

**TIMBER & LOGGING, LLC.**, a North Carolina limited liability company

By: _____

Name: Joseph Randall Eller

Title: Manager

DocuSign Envelope ID: D854DBB6-276D-4051-BBD6-BFA05B6470BD

**RAF/LENDER/RABO:**

**RABO AGRIFINANCE LLC,** a Delaware
limited liability company

By: _____
Name: Jeffrey Hanson
Title: VP-LFR

DocuSign Envelope ID: D854DBB6-276D-4051-BBD6-BFA05B6470BD

## **<u>EXHIBIT A</u>**

Phase I Additional Collateral

[All Phase I Property on Spreadsheet]

| | | | Phase One - Additional Collateral | | | | | | |
|---|---|---|---|---|---|---|---|---|---|

**Grayson Farm & Leasing, Inc.**

| Year | Owner | County | Description | Parcel | Acres | Value | Liabilities | Cracon Tree Lease | Potential Value |
|---|---|---|---|---|---|---|---|---|---|
| 2020 | GFL | Floyd | Mountain Meadows Dairy | 79-95 | 65.880 | $ 273,800.00 | | | |
| 2020 | GFL | Floyd | Mountain Meadows Dairy | 79-97 | 4.630 | $ 20,800.00 | | | |
| 2020 | GF&L | Patrick | Mountain Meadows Dairy | 4214-52-a | 7.2944 | $ 20,100.00 | | | |
| 2020 | GF&L | Patrick | Mountain Meadows Dairy | 4214-52-B | 16.3519 | $ 58,900.00 | | | |
| 2020 | GF&L | Patrick | Mountain Meadows Dairy | 4214-52-c | 7.4267 | $ 26,700.00 | | | |
| 2020 | GF&L | Patrick | Mountain Meadows Dairy | 4214-71 | 26.8968 | $ 855,600.00 | | | |
| 2020 | GF&L | Patrick | Mountain Meadows Dairy | 4214-53C | 30.9 | $ 83,400.00 | | | |
| 2020 | GF&L | Patrick | Mountain Meadows Dairy | 4214-53-B | 13.5 | $ 42,800.00 | $ 452,993.07 | | $ 929,106.93 |

**Mountain Top Holdings, LLC**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 2005 | MTH | Smyth Co.-LU | Shannon Gap Rd | 33-A-4A | 105.5 | $ 114,500.00 | | | |
| 2004 | MTH | Smyth Co.-LU | Shannon Gap Rd/Rt Side Walker Mtn | 33-A-9 | 108.5 | $ 108,500.00 | | | |
| 2020 | MTH | Floyd | Mountain Meadows Dairy | 79-96 | 21.993 | $ 85,000.00 | | | |
| 2020 | MTH | Carroll | Carroll | 18-A-84 | 7 | $ 20,200.00 | | | |
| 2020 | MTH | Carroll | Carroll | 18-A-78 | 7 | $ 36,000.00 | | | |
| 2020 | MTH | Carroll | Mountain Meadows Dairy | 106-A-20 | 25.1756 | $ 90,100.00 | | | $ 454,300 |

**Elk Creek Land Holdings, LLC**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 2003 | ELK | Smyth Co.-LU | Lick Creek | 11-A-36 | 105.1 | $ 105,100.00 | | | |
| 2003 | ELK | Washing. Co.-LU | Dixie Bauman | 111-A-31 | 74.1 | $ 148,200.00 | | | |
| 1998 | ELK | Surry Co. | Haymore-Dobson | 4976-00-18-8135 | 4 | $ 64,700.00 | | | $ 318,000.00 |

**DD&R Land Holdings, LLC**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 1990 | DD&R | Grayson | Before Sugar Shack Rd. | 74-A-118B | 6.000 | $ 39,000.00 | | | |
| 2004 | DD&R | Grayson | Osborne's | 73A4-5-3 | 1.105 | $ 25,000.00 | | | |
| 2006 | DD&R | Grayson | Osborne's Motel | 73A4-5-6 | 0.904 | $ 65,800.00 | | | |
| 2005 | DD&R | Grayson | Sugar Shack | 75-A-2A | 5.554 | $ 45,500.00 | | | |
| 2005 | DD&R | Grayson | Sugar Shack | 75-A-2 | 15.477 | $ 69,600.00 | | | |
| 1990 | DD&R | Grayson | Sugar Shack Rd./ SR 693 | 55-A-27 | 12.340 | $ 69,700.00 | | | |
| 1990 | DD&R | Grayson | Sugar Shack Rd./joins 118B | 75-A-1 | 100.000 | $ 300,000.00 | | | |
| 1990 | DD&R | Grayson | Sugar Shack Rd./Piney Wood West | 75C-1-6 | 2.029 | $ 21,100.00 | | | |
| 1990 | DD&R | Grayson | Sugar Shack Rd./Piney Wood West | 75C-1-4 | 2.045 | $ 9,200.00 | | | |
| 1990 | DD&R | Grayson | Sugar Shack Rd./Piney Wood West | 75C-1-5 | 2.137 | $ 9,600.00 | | | $ 654,500.00 |

**NDRD Land Holdings, LLC**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 2000 | NDRD | Alleghany Co. | 330 Topia Road | 3011-88-7819 | 34.54 | $ 184,800.00 | | Tree Lease | $ 184,800.00 |

**D&R Land Holdings, LLC**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 2022 | D&R Land | | Yadkin Land | PIN486601167205 | 6.75 | $ 350,000.00 | | | |
| | | | Yadkin Land | PIN486601156716 | 4.95 | | | | $ 1,300,000.00 |

**JRE Individually**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 2015 | JRE | Carroll County | Vannoy & JRE 1/3 | 49-A-139 | 6.393 | $ 160,166.67 | | | |
| 1994 | ETAL | Grayson Co. | Pine Mtn.-Jake - JRE 1/2 | 38-A-38B | 53.675 | $ 161,050.00 | | | |
| 2022 | JRE | Alleghany | Stratford Rd | 3042037718 | 6.13 | $ 40,600.00 | | Tree Lease | |
| | JRE | Carroll | RD 758 | 91-A-7 | 4.312 | $ 21,900.00 | | | |
| | JRE | Alleghany | 633 Stratfor Rd VA | 3042134681 | 69.250 | $ 620,400.00 | $ 316,388.00 | Tree Lease | |
| | JRE | Alleghany | Kennedy Farm -Stratford Road | 3042412985 | 91.400 | $ 396,600.00 | $ 227,762.00 | Tree Lease | $ 856,566.67 |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | Total | $ 4,697,273.60 |

DocuSign Envelope ID: D854DBB6-276D-4051-BBD6-BFA05B6470BD

## **EXHIBIT B**

Phase II Additional Collateral

[All Phase II property on Spreadsheet]

| | | | **Phase Two Additional Collateral** | | | | |
|---|---|---|---|---|---|---|---|
| JRE Individually | | | | | | | |
| Year | Owner | County | Description | Parcel | Acres | Value | Cracon Tree Lease |
| 2021 | JRE/Beverly 1/2 | Grayson | 604 W Main St | 73A2-2-2 | 0.188 | $ 106,600.00 | |
| 2021 | JRE/Beverly 1/2 | Grayson | 604 W Main St | 73A2-2-3 | 0.188 | $ 106,600.00 | |
| 2017 | JRE/Beverly | Ashe Co. | Jefferson Fire District | 09263054 001 | 0.793 | $ 30,000.00 | |
| 2017 | JRE/Beverly | Ashe Co. | Jefferson Fire District - JRE 1/2 | 09263054 007 | 0.829 | $ 15,000.00 | |
| 2013 | JRE LE/Damon | Ashe Co. | JRE Life Estate Damon Owner | 18326026 | 26.055 | $ 130,900.00 | Tree Lease |
| 2013 | JRE LE/Damon | Ashe Co. | JRE Life Estate Damon Owner | 18326027 | 33.174 | $ 303,500.00 | Tree Lease |
| 2015 | JRE | Ashe | Shumate Property | 18-330-095 | 39.000 | $ 196,900.00 | Tree Lease |
| 1986 | JRE | Ashe | Apt Damons house | 18326039 | 0.378 | $ 3,800.00 | |
| | | | | | | | |
| Mountain Top Holdings, LLC | | | | | | | |
| 2018 | MTH | Grayson County | Hoffman/Grant Farm | 30-A-18A, 30-A-18 | 153.114 | $ 643,200.00 | Tree Lease |
| DD&R Land Holdings, LLC | | | | | | | |
| 2007 | DD&R | Ashe | East Healing Springs Road | 18326061 | 1.869 | $ 11,200.00 | |
| 1986 | DD&R | Ashe | Healing Springs Farm | 18326031 | 27.570 | $ 151,400.00 | Tree Lease |
| 1986 | DD&R | Ashe | Herbert Francis Hill | 18326035 | 9.675 | $ 58,100.00 | Tree Lease |
| 2006 | DD&R | Ashe | Howell Land | 18326014 | 38.281 | $ 248,600.00 | Tree Lease |
| 2000 | DD&R | Ashe | J.B. Roark-CatBird | 18330035 | 0.700 | $ 4,200.00 | |
| 1999 | DD&R | Ashe | J.B. Roark-CatBird | 18330132 | 1.919 | $ 38,400.00 | |
| 2017 | DD&R | Ashe | Jameson NCSR 1563 Clifton Rd. | 01365246 | 13.960 | $ 83,800.00 | Tree Lease |
| 1994 | DD&R | Ashe | Walnut Hill, Derrick Eller | 18326037 | 2.290 | $ 72,200.00 | |
| 1999 | DD&R | Ashe | Walnut Hill, Earl Baker | 18326030 | 12.041 | $ 72,300.00 | Tree Lease |
| 1999 | DD&R | Ashe | Walnut Hill, Earl Baker | 18326006 | 3.105 | $ 24,800.00 | Tree Lease |
| 2009 | DD&R | Ashe | William Eller Walnut Hill | 18326028 | 25.979 | $ 129,900.00 | Tree Lease |
| | | | | | | | |
| Timber & Logging, LLC | | | | | | | |
| 2021 | Timber & Logging, LLC | Grayson | Past Lot Left in Independence | 73A4-A-1A | 4.000 | $ 67,600.00 | |
| 1999 | Timber & Logging, LLC | Ashe | John's Place/Poe Farm | 01-365-071 | 104.270 | $ 463,100.00 | Tree Lease |

## <u>EXHIBIT C</u>

R. Eller Equity Interests

1. S-Corporations:

   a. Grayson Farm & Leasing, Inc., Virginia S-Corporation, 100% ownership
   b. Wescor Trucking, Inc., Virginia S-Corporation, 100% ownership
   c. Independence Lumber, Inc., Virginia S-Corporation, 100% ownership

2. Single Member Limited Liability Companies:

   a. Wescor Farm Operations, LLC, f/k/a Wescor Farming, LLC, Virginia
   b. Keyston Farming, LLC, Virginia
   c. Mountain Top Holding of Virginia/North Carolina, LLC, Virginia
   d. Elk Creek Land Holdings, LLC, Virginia
   e. JRE Lumber & Farm, LLC, Virginia
   f. DD&R Land Holdings, LLC, Virginia
   g. NDRD Land Holdings, LLC, Virginia
   h. D&R Land Holdings, LLC, Virginia
   i. Independence Tree Farm & Nursery, LLC, Virginia
   j. Timber & Logging, LLC., North Carolina

3. Shared Ownership:

   a. Indecro Development, LLC, North Carolina partnership, 50% owner
   b. Shatley Springs Estates, LLC, North Carolina, 50% owner

## EXHIBIT D

Known Judgments and Pending Litigation

1.  Southern States Carroll County Cooperative, Incorporated v. Elk Creek Land Holdings, LLC, Mountain Top Holding of Virginia/North Carolina, LLC, and J. Randall Eller, Case No. 035CL23000131-00, pending in the Circuit Court for Carroll County, Virginia.

2.  Meherrin Fertilizer, Inc. v. Wescor Farm Operations, LLC and J. Randall Eller, Case No. CL 23-59, Grayson County Circuit Court, Judgement by Confession on July 7, 2023.

3.  Meherrin Fertilizer, Inc. v. J. Randall Eller, Damon Randall Eller, Beverly Black, Timber & Logging, LLC, Case No, 23-CVS-306, pending in the General Court of Justice, Superior Court Division, Ashe County, NC.

4.  RGM Erectors, Inc. v. Randall Eller, Case No. CL23-55, pending in the Circuit Court for the County of Bland, Virginia.

5.  James River Equipment Virginia, LLC v. Wescor Farm Operations, LLC and J. Randall Eller, Case No. CL23-2296, pending in the Circuit Court for the City of Roanoke, Virginia.

6.  4M Distributing, Inc. v. Wescor Farm Operations, LLC, judgment granted by Grayson County Circuit Court on June 30, 2023 in the amount of $111,686.88.

![DocuSign]

## Certificate Of Completion

Envelope Id: D854DBB6276D4051BBD6BFA05B6470BD — Status: Completed
Subject: Complete with DocuSign: ELLER - Rabo - Forbearance Agreeement (Execution Version 12-20-23).pdf
Source Envelope:
Document Pages: 28 — Signatures: 8 — Envelope Originator:
Certificate Pages: 5 — Initials: 0 — W. Watts Burks, IV
AutoNav: Enabled — Woods Rogers Vandeventer Black PLC
EnvelopeId Stamping: Enabled — 101 W Main St Ste 500
Time Zone: (UTC-05:00) Eastern Time (US & Canada) — Norfolk, VA 23510
Watts.Burks@wrvblaw.com
IP Address: 4.31.203.74

## Record Tracking

Status: Original — Holder: W. Watts Burks, IV — Location: DocuSign
    12/20/2023 2:58:47 PM —     Watts.Burks@wrvblaw.com

| Signer Events | Signature | Timestamp |
|---|---|---|
| Joseph Randall Eller<br>randalleller4@gmail.com<br>Member manager member manager<br>Security Level: Email, Account Authentication (None) | *[signature: J Randall Eller]*<br>7BD0CC417D09468...<br><br>Signature Adoption: Drawn on Device<br>Using IP Address: 206.74.181.168 | Sent: 12/20/2023 3:04:46 PM<br>Resent: 12/21/2023 8:59:53 AM<br>Viewed: 12/21/2023 9:02:37 AM<br>Signed: 12/21/2023 9:03:26 AM |

**Electronic Record and Signature Disclosure:**
    Accepted: 12/21/2023 9:02:37 AM
    ID: 43c115ae-b932-4abe-bbe5-9f54b28a4c27

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Mike Hastings<br>Michael.Hastings@wrvblaw.com<br>Principal<br>Security Level: Email, Account Authentication (None) | COPIED | Sent: 12/20/2023 3:04:47 PM |

**Electronic Record and Signature Disclosure:**
    Accepted: 11/15/2023 8:14:25 PM
    ID: dd312f53-da33-4801-b7db-e5d95f3bef8c

| | | |
|---|---|---|
| Tara Adams<br>tara@adamsdelp.com<br>President<br>Security Level: Email, Account Authentication (None) | COPIED | Sent: 12/20/2023 3:04:47 PM |

**Electronic Record and Signature Disclosure:**
    Not Offered via DocuSign

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| W. Watts Burks, IV<br>watts.burks@wrvblaw.com<br>Security Level: Email, Account Authentication (None) | **COPIED** | Sent: 12/20/2023 3:04:47 PM<br>Resent: 12/21/2023 9:03:30 AM |
| **Electronic Record and Signature Disclosure:**<br>    Not Offered via DocuSign | | |

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 12/20/2023 3:04:47 PM |
| Certified Delivered | Security Checked | 12/21/2023 9:02:37 AM |
| Signing Complete | Security Checked | 12/21/2023 9:03:26 AM |
| Completed | Security Checked | 12/21/2023 9:03:26 AM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

From time to time, Vandeventer Black LLP (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to this Electronic Record and Signature Disclosure (ERSD), please confirm your agreement by selecting the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

### Getting paper copies

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after the signing session and, if you elect to create a DocuSign account, you may access the documents for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

### Withdrawing your consent

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

### Consequences of changing your mind

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. Further, you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

### All notices and disclosures will be sent to you electronically

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact Vandeventer Black LLP:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
To contact us by email send messages to: helpdesk@vanblacklaw.com

**To advise Vandeventer Black LLP of your new email address**

To let us know of a change in your email address where we should send notices and disclosures electronically to you, you must send an email message to us at helpdesk@vanblacklaw.com and in the body of such request you must state: your previous email address, your new email address. We do not require any other information from you to change your email address.

If you created a DocuSign account, you may update it with your new email address through your account preferences.

**To request paper copies from Vandeventer Black LLP**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an email to helpdesk@vanblacklaw.com and in the body of such request you must state your email address, full name, mailing address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with Vandeventer Black LLP**

To inform us that you no longer wish to receive future notices and disclosures in electronic format you may:

i. decline to sign a document from within your signing session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

ii. send us an email to helpdesk@vanblacklaw.com and in the body of such request you must state your email, full name, mailing address, and telephone number. We do not need any other information from you to withdraw consent..  The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

The minimum system requirements for using the DocuSign system may change over time. The current system requirements are found here: https://support.docusign.com/guides/signer-guide-signing-system-requirements.

**Acknowledging your access and consent to receive and sign documents electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please confirm that you have read this ERSD, and (i) that you are able to print on paper or electronically save this ERSD for your future reference and access; or (ii) that you are able to email this ERSD to an email address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format as described herein, then select the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

By selecting the check-box next to 'I agree to use electronic records and signatures', you confirm that:

- You can access and read this Electronic Record and Signature Disclosure; and
- You can print on paper this Electronic Record and Signature Disclosure, or save or send this Electronic Record and Disclosure to a location where you can print it, for future reference and access; and
- Until or unless you notify Vandeventer Black LLP as described above, you consent to receive exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you by Vandeventer Black LLP during the course of your relationship with Vandeventer Black LLP.